UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **PPG INDUSTRIES, INC.** | : | **CIVIL ACTION NO. 2:16-cv-1302** |
| **VERSUS** | : | |
| | | **UNASSIGNED DISTRICT JUDGE** |
| **LOCAL 470 INTERNATIONAL ASSOCIATION OF MACHINISTS** | : | |
| **& AEROSPACE WORKERS** | : | **MAGISTRATE JUDGE KAY** |

## REPORT AND RECOMMENDATION

Before the court are Motions for Summary Judgment [docs. 19, 25] filed, respectively, by defendant Local 470 Association of Machinists & Aerospace Workers and plaintiff PPG Industries, Inc. Both motions are opposed and have been referred to the undersigned for review, report, and recommendation in accordance with 28 U.S.C. § 636.

### I.
#### BACKGROUND

PPG Industries, Inc. ("PPG") filed this suit on September 15, 2016, requesting that the court vacate a labor arbitration award made on June 20, 2016. Doc. 1. PPG was then the owner and operator of a chemical manufacturing plant in Lake Charles, Louisiana. *Id.* at 2. PPG and Local 470 Association of Machinists & Aerospace Workers ("the Union"), the collective bargaining unit representing employees at that facility, were parties to a collective bargaining agreement ("CBA") which established the terms and conditions of PPG employees' work at the Lake Charles complex. *Id.* at 2–3; *see* doc. 19, att. 5, pp. 203–44.

The labor dispute arose from PPG's decision to use contract operators, rather than bargain unit members, to operate newly installed waste presses in 2015. For over twenty years prior to this decision, PPG had leased portable waste presses from a contractor, and used the contractor's employees to operate those presses, in order to handle waste disposal at the Lake Charles complex. Doc. 19, att. 5, pp. 15–16, 69. In early 2015, PPG informed the Union that it had decided to stop leasing the presses and instead purchase and install its own machines at the Lake Charles complex. *Id.* at 44–46, 88–90. The new waste presses went into operation on April 21, 2015, with contract employees operating the machines. *Id.* at 88–90. The Union asserts that it first became aware that the new presses were in operation on April 22, 2015. *See id.* at 29–32.

The Union filed a grievance on May 4, 2015, complaining of PPG's use of contract operators on the new waste presses.[1] *Id.* at 245. PPG answered the Union's grievance the same day, asserting that its decision to subcontract work on the new waste presses fell within its authority under Article V, Section 2 ("the Management Clause") of the CBA.[2] *Id.* The Union appealed and PPG answered the Union's appeal with another assertion of its rights under the Management Clause. *Id.* at 246. On March 16, 2016, while the parties were preparing for arbitration, PPG also informed the Union that it considered the grievance untimely under Article XX, Section 2 of the CBA because it had not been presented within ten days of the "Date of Incident." *Id.* at 166.

Arbitrator Samuel J. Nicholas, Jr., heard the case on April 13, 2016, and issued his opinion two months later. *Id.* at 1–117; doc. 19, att. 4. He concluded that the grievance was timely under the CBA because it dealt with "an ongoing issue that still exists." Doc. 19, att. 4, p. 10. He also

---

[1] That grievance identifies April 28, 2015, as the "Date of Incident." Union chairman Brent Duhon stated at the hearing that this was a typographical error. Doc. 19, att. 5, p. 31.

[2] PPG's answer erroneously cited Article II, Section 2 of the CBA. Doc. 19, att. 5, p. 245. This provision describes the binding effect of the CBA, while Article V, Section 2 contains the quoted language from PPG's answer and is designated as the "Management Clause." Doc. 19, att. 5, pp. 203, 205.

found that PPG's actions did not violate the Management Clause as the Union had asserted. *Id.* at 10–11. Nevertheless, Nicholas continued, PPG should have created new bargaining unit positions to man the newly purchased waste presses rather than continuing to subcontract the work as it had done when it leased the presses, and its failure to do so violated Article VI, Section 3 of the CBA. *Id.* at 11–13. Nicholas therefore sustained the grievance, ordering PPG to discontinue the use of contract workers on the waste presses and to replace those workers with bargaining unit employees. *Id.* at 13–14.

PPG seeks to vacate the arbitral award under Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185; and the Federal Arbitration Act, 9 U.S.C. § 1 *et seq.* Doc. 1. The record in this matter has been submitted, and PPG and the Union have filed cross-motions for summary judgment. In its motion for summary judgment, the Union also requests attorney's fees. Doc. 19, att. 1, pp. 9–10. Accordingly, the court now considers whether to vacate or affirm the arbitral award and then, if affirmation is recommended, the Union's request for attorney's fees.

## II.
### LEGAL STANDARDS

#### A. *Summary Judgment*

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56. The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty*

*Lobby, Inc.*, 106 S.Ct. 2505, 2511 (1986) (quotations omitted). This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim. *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 106 S.Ct. at 2511 (citations omitted).

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 120 S.Ct. 2097, 2110 (2000). The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000). Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party. *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008). On cross-motions for summary judgment, the court reviews each motion independently with the above deference granted to the non-moving party's submissions. *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001).

**B. Review of arbitral award**

PPG seeks review of this case under both Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, and the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 *et seq.* The LMRA applies to collective bargaining agreements and the FAA applies to individual arbitration agreements. *Int'l Chem. Workers Union v. Columbian Chems. Co.*, 331 F.3d 491, 494 (5th Cir. 2003). Still, courts may look to the FAA for guidance in cases arising under Section 301 of the LMRA and involving a CBA. *Id.* (citing *United Paperworkers Int'l Union v. Misco*, 108 S.Ct. 364, 372 n. 9 (1987)).

Review of an arbitral award under either statute is exceptionally narrow. Under the FAA, the court may only vacate an award if (1) it was procured by corruption, fraud, or undue means; (2) there is evidence of partiality or corruption in the arbitrators; (3) the arbitrator engaged in misconduct which prejudiced the rights of one of the parties; or (4) the arbitrator exceeded his powers. 9 U.S.C. § 10(a)(1)–(4). The award may also be vacated where the arbitrator "strays from interpretation and application of the agreement and effectively dispenses his own brand of industrial justice." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 130 S.Ct. 1758, 1767 (2010) (cleaned up).

Under the LMRA, the collective bargaining agreement circumscribes the arbitrator's jurisdiction. *Bruce Hardwood Floors, Div. of Triangle Pac. Corp. v. UBC, Southern Council of Indus. Workers*, 103 F.3d 449, 452 (5th Cir. 1997). As long as the arbitrator is acting within that jurisdiction, he is entitled to substantial judicial deference. *Id.* Accordingly, the district court may not set aside the arbitrator's decision if the "decision 'draws its essence from the collective bargaining agreement' and the arbitrator is not fashioning 'his own brand of industrial justice.'" *Weber Aircraft, Inc.*, 253 F.3d 821, 824 (5th Cir. 2001) (quoting *Misco*, supra, 108 S.Ct. at 370). An arbitral award draws its essence from the CBA "so long as it is rationally inferable in some logical way from the agreement." *Folger Coffee Co. v. Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am.-UAM, Local Union No. 1805*, 905 F.2d 108, 110 (5th Cir. 1990) (internal quotations omitted). Alleged factual errors or misinterpretations of the CBA do not provide a sufficient basis for vacatur under the LMRA, "as long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority." *Id.* (quoting *Misco*, 108 S.Ct. at 371).

## III.
### APPLICATION

This matter was submitted for arbitration under Article XXI of the CBA. Section Four of that article contains the following definition of the arbitrator's jurisdiction:

> The impartial arbitrator shall have jurisdiction to apply, interpret or determine compliance with a section of this agreement, but may not modify, add to or detract from any provision of this Agreement or have any authority in [the] making of a new agreement.

Doc. 19, att. 5, p. 225. In its motion for summary judgment, PPG maintains that the arbitral award must be vacated because Nicholas exceeded his jurisdiction by (1) determining that the grievance was timely filed and (2) sustaining the grievance under Article VI, Section 3. Doc. 25, att. 1. The Union asserts that the award must be affirmed because the Nicholas's procedural and merits determinations were based on proper exercises of his authority under/interpretation of the CBA. Doc. 19, att. 1.

### A. *Timeliness determination*

PPG challenged the timeliness of the Union's grievance under Article XX, Section 2 of the CBA, which provides in relevant part:

> The procedure for orderly and prompt disposal of employee grievances shall be as follows, providing the grievance is presented within ten (10) days after the alleged occurrence, except in cases where the affected employee was absent from work on the date of the occurrence, in which case the grievance must be entered no later than the tenth (10th) day after his return to work.

Doc. 19, att. 5, p. 224. The grievance in this matter was filed on May 4, 2015, over ten days after the Union admitted it became aware of the use of contract labor on the new presses. Nicholas,

however, found that the grievance was timely because it concerned "an ongoing issue that still exists."[3] Doc. 19, att. 4, p. 10.

The timeliness provisions of the CBA make no mention of a continuing violations allowance or any other exception to the ten-day limit. An arbitrator is permitted to look beyond the written CBA, however, "if it is ambiguous or silent upon a precise question." *Beaird Indus., Inc. v. Local 2297 Intern. Union*, 404 F.3d 942, 946 (5th Cir. 2005) (quoting *Delta Queen Steamboat Co. v. Dist. 2 Marine Eng'rs Beneficial Ass'n*, 889 F.2d 599, 602 (5th Cir. 1989)). Here the CBA provided only that the time limit ran from the date of "the alleged occurrence," allowing sufficient ambiguity for Nicholas's interpretation that the occurrence might encompass not just the beginning of operation of new presses with contract labor or the Union becoming aware of it but each date that passed with those circumstances under a continuing violation theory. Accordingly, PPG fails to show that the arbitrator exceeded his jurisdiction on this issue and is not entitled to vacatur based on the timeliness ruling.

**B. *Subcontract ruling***

PPG denied the Union's grievance and defended the continued use of contract labor on the waste presses based on the Management Clause (Article V, Section 2), which provides:

> The function of Management shall be expressly reserved to the Company, under which it shall have, among others . . . the right to hire new employees and to direct the working force, to discipline, suspend or discharge for just cause, transfer, and lay off employees; the Company will . . . subcontract work where the purpose and intent is not to reduce the regular working force . . . . The exercise of these privileges of Management shall not be in violation of any of the terms and conditions of this agreement.

---

[3] The arbitrator did not address the Union's argument that PPG had waived any objection to timeliness by waiting eleven months (after it had twice denied the grievance on the merits) to raise the issue. Accordingly, we do not address the argument here.

Doc. 19, att. 5, pp. 204–05. The arbitrator agreed with PPG that its actions did not violate the Management Clause, noting that the decision to subcontract "[c]learly" did not reduce the size of the current bargaining unit because "prior to the installation, no Bargaining Unit Employees had been performing the labor associated with the press." Doc. 19, att. 4, p. 11. He sustained the grievance, however, as described above, determining that PPG's decision to continue subcontracting resulted in a violation of the CBA under Article VI, Section 3. *Id.* at 11–14.

Article VI is titled "Wages," and Section 3 of that article is "New Jobs." The section reads in full:

> It is recognized that changing conditions may, from time to time, require the establishment of new occupations, expansions, or job classifications. This may be due to new manufacturing processes, new units, new occupations, etc. In such cases management will develop an appropriate wage rate and fill the job with an eligible employee. The Company will notify the Union of the rate and the beginning date of the forty-five (45) day period when a new job is established.

Doc. 19, att. 5, p. 205. The arbitrator determined that the decision to purchase new waste presses represented "a changing work condition" and that Article VI, Section 3 therefore obligated PPG to create new positions. Doc. 19, att. 4, pp. 11–13. However, the bulk of his analysis focused on the Union's arguments that "a new position should have been created in light of . . . past practice and new responsibilities by which the [bargaining unit employees] are required to abide," namely the use of bargaining unit employees to operate waste presses in other units and the fact that bargaining unit employees were now required to perform maintenance on the waste presses still being operated by contract workers. *Id.*

PPG maintains that Nicholas did not interpret the CBA, but instead went beyond the agreement in express violation of his jurisdiction and imposed additional limitations on PPG's subcontracting authority beyond what the CBA provided. Doc. 25, att. 1, pp. 20–25. It argues that

Article VI, Section 3, is patently inapplicable to the company's subcontracting authority and merely sets the wage rate consultation requirements that arise "when management exercises its . . . right to . . . create a new occupation or job classification." Doc. 28, p. 4.

The Union asserts that the arbitrator properly interpreted the CBA in light of the substance of the Union's grievance. Doc. 19, att. 1, pp. 7–9. It argues that the grievance was based on PPG's "continued reliance on its right to subcontract under the changing condition of its purchase and installation of a permanent waste press" and that "there was no longer an issue of subcontracting, per se, but rather a question of whether [PPG's] continued exercise of its right to subcontract violated other parts of the parties' [CBA]." Doc. 27, p. 12. Accordingly, it asserts, and based on the Management Clause's limitation that privileges not be exercised in a way that violates any other part of the CBA, the arbitrator properly interpreted the contract or at least conducted an interpretation sufficiently within the bounds of the CBA to bar second-guessing from this court. *Id.* at 12–14.

The Fifth Circuit has, on a few occasions, considered challenges to arbitral awards based on a company's authority (or lack thereof) to subcontract. *See Delek Refining, Ltd. v. Local 202, United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. And Svc. Workers Int'l Union*, 891 F.3d 566, 569–72 (5th Cir. 2018); *Resolution Performance Prods., LLC v. Paper Allied Indus. Chem. and Energy Workers Intern. Union, Local 4-1201*, 480 F.3d 760, 767–68 (5th Cir. 2007); *Beaird*, 404 F.3d at 943–47; *Folger*, 905 F.2d at 111; *Rock-Tenn Co. v. Paper, Allied-Indus., Chem. & Energy Workers Int'l Union*, 108 Fed. App'x 905, 906 (5th Cir. 2004). In *Beaird* and *Rock-Tenn*, the court upheld district court decisions vacating the arbitral awards after determining that the arbitrator had read additional limits on subcontracting authority into the unambiguous language of the respective CBAs (both of which placed no limits on management's

subcontracting authority). 404 F.3d at 946–47; 108 Fed. App'x at 906–07. In *Delek*, *Resolution Performance*, and *Folger*, on the other hand, the Fifth Circuit affirmed arbitral awards after determining that the clauses at issue were ambiguous or silent on the scope of the company's subcontracting authority, and deferred to the arbitrator's authority to make decisions about that scope based on other factors like past dealings between the parties, industry practice, and other sources of law. 891 F.3d at 569–72; 480 F.3d at 767–68; 905 F.2d at 111.

Here, unlike the CBAs at issue in *Beaird* and *Rock-Tenn*, the CBA does provide a limitation on subcontracting authority and a general limit on exercise of management powers.[4] However, the plain language of the clauses at issue leaves no room for ambiguity. The arbitrator maintained that the CBA mandated creation of new bargaining unit positions, and thereby forbade continued subcontracting, upon the occurrence of a changing condition, based upon his explanation of Article VI, Section 3. That provision is set within an article dealing exclusively with wage issues, and the two preceding sections identify the current wage schedules and adjustment rates for existing positions. Doc. 19, att. 5, p. 205. Section 3 provides that changing conditions "**may**, from time to time, require" that "new occupations, expansions, or job classifications" be created. *See* doc. 19, att. 5, p. 205. It then sets forth how PPG must proceed in notifying the union about the new position and rate, and subsequent provisions show how the Union can express itself if dissatisfied with the proposed rate. *Id.* Nothing in that clause or article, however, can even arguably be read as setting forth additional limitations under which work cannot be subcontracted or under which new bargaining unit positions **must** be created. Instead, the Management Clause provides the only specific limitation on the authority to subcontract within the CBA – that subcontracting cannot be

---

[4] Meanwhile, unlike the CBAs at issue in *Delek*, *Resolution Performance*, and *Folger*, the subcontracting clause at issue here is not ambiguous or silent on the limits of the company's subcontracting authority and the other provision of the CBA from which the Union attempts to graft on additional terms is plainly inapplicable.

done in a way to reduce the bargaining unit. Although that clause also provides that management authority could not be exercised in a way that violated any other provision of the CBA, there is simply no basis to find any additional restrictions in subcontracting authority under the wages provisions, much less a violation from the actions challenged in the instant grievance. The arbitrator's attempts to twist unambiguous clauses in order to make a policy- or practice-based judgment against the company's decision cannot masquerade as contract interpretation. Such an analysis is not "rationally inferable in some logical way from the CBA." *Folger*, 905 F.2d at 110 (internal quotations omitted). It instead represents the arbitrator's attempts to exceed his jurisdiction and impose his own brand of industrial justice.

Accordingly, the arbitral award must be vacated insofar as it sustained the Union's grievance under Article VI, Section 3. Having recommended that the award be vacated, this court finds no basis for recommending that attorney's fees be awarded to the Union.

## IV.
### CONCLUSION

For the foregoing reasons, **IT IS RECOMMENDED** that PPG's Motion for Summary Judgment [doc. 25] be **GRANTED**, that the Union's Motion for Summary Judgment [doc. 19] be **DENIED**, and that the arbitral award be **VACATED** insofar as the grievance was sustained under Article VI, Section 3 of the CBA.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon

grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996).

THUS DONE this 30th day of August, 2018.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE